ENOCH C. ROBERTS, PLAINTIFF IN ERROR, *v.* JAMES M. COOPER.

This court again decides, that after a case has been brought here and decided, and a mandate issued to the court below, if a second writ of error is sued out, it brings up for revision nothing but the proceedings subsequent to the mandate.

The deposition of an officer of the General Land Office, as to the opinions and practice prevailing in that office, cannot be read to the jury as proof of the law, although it might have influence with the court in explaining the law to the jury.

The ancient English doctrines respecting maintenance or champerty have not found favor in the United States; and in Michigan (where the land lies which is involved in the present controversy) its application to sales, by one out of possession, has been annulled.

Although, in that State, an agreement to carry on a suit upon condition of receiving a share of the proceeds might be void, yet the rule would not apply to a transfer of the legal estate to one, in trust for himself and the other stockholders in a corporation.

THIS case was brought up, by writ of error, from the Circuit Court of the United States for the district of Michigan.

It was the same case which was before this court at December term, 1855, and is reported in 18 Howard, 173.

A venire *de novo* having been ordered, the case came up again for trial, on the circuit, in June, 1856. The result was a verdict and judgment in favor of Cooper, the lessor of the plaintiff in the original action.

The bill of exceptions stated that an agreed state of facts, dated Washington city, April 17th, 1854, signed by S. F. Vinton for plaintiff, and Truman Smith for defendant, with all the papers therein referred to and thereto annexed, was read in evidence to the jury, a true copy of which statement, with the papers thereto annexed, is hereto appended.

And there was also put in evidence, and read to the jury, a statement and stipulation, dated June 24th, 1856, and signed by S. F. Vinton for the plaintiff, and T. Romeyn for the defendant, together with the papers therein referred to and at-

tached thereto, a true copy of which statement, with a copy of all the papers thereto annexed, is hereto appended. The plaintiff objected to the reading of the deposition of John Wilson, and the court excluded the same from the jury, to which ruling the defendant excepted.

The defendant then produced and offered to prove a deed of release from Alfred Williams and wife to the Minnesota Mining Company, dated June 20th, 1856, covering the lands in controversy; and further offered to prove, in connection therewith, that at the time when the said Cooper obtained the deed of the premises in controversy from Alfred Williams, the Minnesota Mining Company was in actual and open possession of the same, claiming title under their patent from the United States, and that the said Cooper knew of such claim and occupancy before and at the time of his purchase, and of said conveyance; that he obtained said title from Alfred Williams, he being the naked trustee of John Bacon, and that all the negotiations for the said purchase, and the purchase itself, were had between said Cooper and Bacon, the said Williams acting under the directions and for the benefit of said Bacon, and having or claiming no personal interest in said lands; that said purchase and conveyance were made for the following purpose, namely: That said Cooper should hold the same in trust for a corporation known as the National Mining Company, all of whose stock was held by said John Bacon; and by the conditions of said sale, the said Cooper was to receive, and did receive, with said conveyance, six-tenths of the stock aforesaid, and the said Bacon was to retain, and did retain, four-tenths of said stock. That the said Cooper purchased said stock, and took said conveyance, with a full knowledge of the claims and occupancy of the Minnesota Mining Company, and with the intention of prosecuting the title purchased by him, by legal proceedings in this court against the Minnesota Mining Company, for the benefit of the National Mining Company; and that before said conveyance was delivered to him by said Williams, the said Cooper, in conjunction with the said Bacon, applied to counsel in the city of Detroit, to employ such counsel in the litigation aforesaid, which was to be had with the Minnesota Mining Company—to which evidence the plaintiff objected, and the court excluded the same—to which the defendant excepted.

The bill of exceptions then stated sundry prayers offered by the defendant upon points which were covered by the decision of this court in 18 Howard, and which it is not thought necessary to insert.

The defendant further requested the court to charge the jury, that if, when said Williams conveyed to said Cooper the prem-

*Roberts* v. *Cooper.*

ises in question, the said Minnesota Mining Company was in actual and open possession of said lands, claiming title thereto under their patent, the said conveyance was void in law against the said company and all claiming under them; which instructions the court refused to give, and to this ruling the defendant excepted.

Upon these exceptions the case came up to this court, and was argued by *Mr. Truman Smith* and *Mr. Reverdy Johnson* for the plaintiff in error, and *Mr. Vinton* for the defendant.

The counsel for the plaintiff in error made the following points:

I. The plaintiff in error, who was the defendant below, should have a rehearing accorded to him on the whole case, irrespective of the former decision.

1. The statute of Michigan gives to the defendant in ejectment an opportunity for a new trial before he is dispossessed. (Mich. Rev. Stat., 492.)

On a revision of the case, the party is to be heard at large, both as to the law and fact. Besides, in this case, the former verdict and the intermediate rulings were all in favor of the defendant below; and therefore it might well happen that he did not (as the fact was) introduce all the evidence at his command, nor take all the available grounds of defence.

2. In this case, the court was obliged to deal with questions arising under the acts of Congress, which treat of a peculiar subject in a new and special manner, and therefore it could not avail itself of the aids of familiar practice and analogous adjudication, usually at command in disposing of cases arising under our land laws, and often throwing much light on the path to satisfactory results. The court, on the former occasion, without knowing, or having any means of knowing, what had been the contemporaneous construction of the act of March 1st, 1847, and what had been the uniform action and course of the Executive in carrying that act into effect, could only look to the terms in which it is conceived; and as it is, to some extent at least, wanting in perspicuity, it is no matter of surprise that a contrariety of opinion should have existed on the bench, or that the court should have arrived at conclusions with some difficulty and hesitation. The new lights alluded to now appearing, on the deposition of the late Commissioner Wilson, and the court being informed that all these lease titles stand on precisely the same footing, it can hardly fail to realize the propriety of giving the act of March 1st a careful re-examination, before it adopts as irreversible a construction

which must subvert numerous titles, and involve in ruin millions of capital. The circumstance that there are numerous properties to be deeply affected by the judgment of the court, where the parties interested have no opportunity to be heard, constitutes a strong reason for according to the plaintiff in error a rehearing, without prejudice—thus realizing one of the principal objects of the statute alluded to.

3. On a careful analysis of the record, it will be found to involve—

  *a.* Two questions arising out of objections, made on the former hearing by the present plaintiff in error, to the title of the defendant in error, based on the compact with Michigan for school lands, or rather on the terms in which that compact is expressed; which objections stand on this record precisely as they stood before; and which, having been fully considered and disposed of adversely to the present plaintiff, are not now renewed.

  *b.* A question arising out of an objection made by the same party to the title of the present defendant, based on the laws of the State of Michigan, which will be renewed for the purpose of submitting acts of the Michigan Legislature that escaped notice on the former hearing, and have, it is conceived, a most important bearing on the matter in issue.

  *c.* A question on the construction to be given to the compact between the United States and Michigan, relative to school lands, insisted on by the defendant in error at the former hearing, and constituting an objection to the title of the Minnesota Mining Company, which was, impliedly at least, overruled by the court, and will doubtless be now renewed; therefore the subject must be re-examined by us (the counsel for the plaintiff in error.)

  *d.* A question on the construction to be given to the acts of Congress of March 1st, 1857, and September 26th, 1850, which the defendant in error contended, and which a majority of the court held, to be fatal to the title of the plaintiff in error. This question will be re-examined in connection with new and very material facts, appearing on the record, which change, it is conceived, the whole aspect of the case. It will be insisted, that if there be anything in this objection, neither the Minnesota Mining Company nor the defendant in error have any title to the lands in dispute, that they remain and are public land, and consequently the defendant in error cannot recover.

  *e.* A question on the admissibility of the evidence offered by the plaintiff in error on the trial below, to show that the deed by which the defendant in error derived title was void, by reason of a champertous agreement made by and between him

(the defendant in error) and John Bacon, in equity the owner of the property in dispute.

*f.* A question as to the regularity of the verdict and judgment below, and whether the former should not be set aside, and the latter reversed, for reasons which appear of record.

4. The circumstance that the court was not full on the former occasion, and that there was a divided opinion, in connection with the vast interests at stake, constitute strong reasons why there should be a rehearing without prejudice.

[The second, third, fourth, and sixth points are omitted, as being covered by the decision in 18th Howard. The fifth referred to that part of the bill of exceptions which involved the charge of champerty.]

It is difficult to conceive a more aggravated case of champerty. Hence we insist that the deed from Williams and wife to Cooper, executed at the request of Bacon, in performance of this corrupt agreement on his part, was utterly void; and that therefore the evidence was clearly admissible.

Before the enactment of the revision of 1846, by the Legislature of Michigan, it was held, in conformity with the principles of the common law, by the courts of that State, that a grant of land is inoperative and void, if, at the time of the grant, such land is in the actual possession of another, claiming under a title adverse to the grantee. (1 Doug. Rep., 19, 38; Buckner's Lessee *v.* Lawrence; ib., 546, 566; Stockton *v.* Williams, Walker's Ch. Rep., 260; Godfrey *v.* Desbrow.)

But by the revision of 1846, tit. xiv, ch. 65, sec. 7, the Legislature enacted, that "no grant or conveyance of land, or interest therein, shall be void, for the reason that, at the time of the execution thereof, such lands shall be in the actual possession of another claiming adversely." By this provision, the Legislature undoubtedly abolished so much of the common law of the State as inhibited the purchase, under the circumstances named, of disputed titles; but it is submitted that they did not abrogate the common law on the subject of champerty. It is believed that the following remarks, to evince the invalidity of the deed from Williams and wife to Cooper, will not be deemed inappropriate:

1. What is champerty at the common law? "It is," says Lord Coke, (in his Com. on Litt. Ins., 368 *b*,) "to maintain to have a part of the land, or anything out of the land, or part of the debt, or other thing in plea or suit; and this is *campipartia*, or *champertie*. The circumstance that the champertous agreement is a verbal one makes no difference; for Fitz. Nat. Brev., 171, A, says, that 'the writ of champerty lieth where a man, by covenant or agreement, made by writing or by word,

agreeth to have a part of the thing, or land, or debt, which is in suit, that shall be recovered if the party recover, to maintain and aid him in the action and in the manner for which he sueth.' (a.) 'Then he who is grieved shall have this action against him who maintaineth the suit for the same intent.'" The author then proceeds to give the form of the writ which is not material to the argument, and therefore is omitted. "Champerty is the most odious species of maintenance." (Comyns, Dig., tit. Maintenance, A 2.) "If he who maintains another is to have, by agreement, a part of the land or debt, &c., in suit, it is called champerty," (ib.;) "or if he agrees to have a rent or other profit out of the land," (ib.,) "though the agreement be by parol or deed." (Ib.) Blackstone, in his Com., vol. 4, p. 135, speaks of these champertors as "the pests of civil society, that are perpetually endeavoring to disturb the repose of their neighbors, and officiously interfering in other men's quarrels, even at the hazard of their own fortunes;" and he adds, they "were severely animadverted on by the Roman law."

2. Champerty is an offence at the common law, irrespective of the old English statutes on the subject. (Com. Dig., tit. Maintenance, A 2; 4 Kent. Com., p. 449; Story's Eq. Com., sec. 1048; 3 Greenl. Ev., sec. 180; 1 Russell on Crimes, 180; 3 Vesey, jr., 449, Wallis v. The Duke of Portland; 11 Mass. Rep., 549, Sweet v. Poor; 5 Pick. Rep., 348, Brinley v. Whitney; ib., 353, per Parker, C. J.; 9 Metc. Rep., 489, Lathrop v. Amherst Bank; 22 Wend. Rep., 403, Small v. Mott; ib., 405, 406, per Walworth, Ch.; 1 Ham. Rep., Ohio, 132, Key v. Vattier; 13 ib., 175, Weekly v. Hale; 4 Litt., 417, Rust v. Larue; 5 Monr., 416, Brown v. Beauchamp; 3 S. and M. Rep., 130, Sessions v. Reynolds.)

3. Champerty is *malum in se* at the common law, and was so held to be by Bracton before the enactment of the statutes; (3 Edward I, ch. 28, and ch. 33; and 28 Edw. I, ch. 11, per Walworth, Ch., 22, Wend. Rep., 406.) That learned Chancellor, after denouncing champerty as the worst species of maintenance, and after admitting that the revised statutes of New York had in a general degree abrogated the law of maintenance, adds: "I do not think, however, that an agreement actually champertous, as when a stranger to the subject of litigation, who has no interest therein in law or equity, or in expectancy by the ties of blood or affinity, agrees to assist in embroiling his neighbor in litigation, or in carrying their suits through the different courts after they are commenced, upon a stipulation that he shall receive a share of the fruits of the litigation as a reward for his mischievous interference, can be enforced in courts of justice."

4. The courts in this country have uniformly pronounced against the validity of all contracts or transactions tainted with champerty. In Massachusetts, 11 Mass. Rep., 549, Sweet *v.* Poor; 5 Pick. Rep., 348, Brindley *v.* Whiting; 9 Metc. Rep., 489, Lathrop *v.* Amherst Bank; in New York, 2 Sand. Supr. Ct. Rep., 141, Satterlee *v.* Frazer; 5 John. Ch. Rep., 44, Arden *v.* Patterson; 22 Wend. Rep., 403, Small *v.* Mott; in Ohio, 1 Ham. Rep., 132, Key *v.* Vattier; in Kentucky, 8 B. Mon. Rep., 488, Thompson *v.* Warren; in Alabama, 9 Ala. Rep., 755, Byrd *v.* Oden; 17 ib., 206, Elliott *v.* McClelland; 24 ib., 472, Wheeler *v.* Pounds; in Mississippi, 7 S. and M., 130, Sessions *v.* Reynolds; 11 ib., 249, Doe *v.* Ingersolls; in Tennessee, 11 Humph. Rep., 189, Wilson *v.* Nance; 10 ib., 342, Morrison *v.* Draderick; and in Illinois, 11 Ill. Rep., 558, McGoon *v.* Ankeny. In Dishler *v.* Dodge, 16 How. Rep. S. C. U. S., 622; ib., 632, 633, 645, where Dodge, the defendant in error, treasurer, and tax collector of Cuyahoga county, Ohio, had distrained the amount due for taxes from certain banks in bank notes, and had deposited such notes with the Cleveland Insurance Company, and where the banks had subsequently united in a written and absolute transfer of these notes to the plaintiff in error, who brought replevin, it was held by two of the justices of this court (Catron and Daniel) that the transaction was "disreputable," and the transfer void for champerty. But if, in place of making an absolute sale, the banks had transferred the notes on an express agreement that Dishler should institute an action, prosecute it to consummation, and divide the results as in this case, would not the whole court have united in pronouncing the transfer corrupt, and the title thus attempted to be acquired a nullity? It was precisely because the transfer was absolute, and the banks had, or were to have, no remaining interest, that the majority of the court upheld the transaction.

5. Champerty being deemed immoral, and at the common law rendering all contracts or transactions tainted therewith null and void, it is to be presumed that the common-law rule on that subject obtains in the State of Michigan. "But if maintenance or champerty," says Ch. J. Parker, (1 Pick. Rep., 417, Thurston *v.* Percival,) "is *malum in se,* or an offence at common law, it is to be presumed, without any statute, that the same law is in force there;" that is to say, in the State of New York. But we are not left to presumption in this case; for the Supreme Court of Michigan have held expressly that the common law is in force in that State, except so far as it is repugnant to or inconsistent with its Constitution or statutes. (2 Doug. Rep., 184, Stout *v.* Keyes; ib., 515, Rue High, appellant; ib., 528, per Wing, J.) And they have particularly recog-

nised and enforced the common law, on the subject of main-
tenance and champerty, in that State. (1 Doug. Rep., 19; ib.,
38, Buckner's Lessee *v.* Lawrence; ib., 566, Stockton *v.* Wil-
liams.)

6. The statute of Michigan, Rev., 1846, tit. xiv, ch. 65, sec.
7, p. 263, did no more than remove the illegality of a convey-
ance when there was an adverse possession. It did not touch
the illegality of an agreement tainted with champerty, nor
make a deed, executed in conformity with such agreement,
valid. The statute merely allows a grantee, in a case of adverse
possession, to recover, in his own name, what the law, as it pre-
viously stood, permitted him to do, in the name of his grantor.
(1 Doug. Rep., 546, Stockton *v.* Williams; 5 Pick. Rep., 348,
Brinkley *v.* Whiting; 8 B. Mon. Rep., 368, Ring *v.* Gray; 11
Humph. Rep., 189, Wilson *v.* Nance.)

7. The authorities show that the offence of champerty is quite
distinct from that of the illegality of buying a title in a case of
adverse possession. This distinction is recognised in this coun-
try, both in statutory enactments and by the decisions of the
courts. Thus, in Ohio, it is held that a conveyance of land,
in the adverse possession of another, is not void, (15 Ohio Rep.,
156, Cressinger *v.* Welch;) but that the aid of the courts will
not be given to sanction and enforce champerty or other con-
tracts, contrary to public justice and to the peace and happi-
ness of the community. (1 Ham. Rep., 132, Key *v.* Vattier.)
There can be no champerty without an adverse possession; but
in Michigan there may be a sale or conveyance where there is
an adverse possession, either with or without champerty. In
the latter case, the deed is made valid by the statute referred
to, and in the former it is void at the common law. In Eng-
land, and in most of the States of this Union having laws
against buying disputed titles, the question of champerty can
hardly arise as in this case; but the statute of Michigan, hav-
ing enabled a party disseized to convey notwithstanding, we
now find a champertor in court, invoking the judgment and
process of the court to consummate the illegality. Will the
court aid him? In ordinary cases, the champertor merely con-
tracts to pay or contribute to the expenses of a lawsuit com-
menced, or to be commenced, in the name of the party with
whom the arrangement is made, in consideration of a share of
the proceeds; but Blackstone, in his Commentaries, (4 vol., p.
135,) says, "that, in our sense of the word," champerty "signi-
fies the purchasing of a suit, or right of suing;" and then he
adds: "No man should purchase any pretence to sue in an-
other's right." Quoted and approved by Catron, J., in 16
How. Rep. S. C. U. S., 633.) "I am not aware," says the

learned judge, "that this, as a general rule, has been disputed." Certainly not, if the case involves a division of proceeds; and this is exactly what Mr. Cooper has done. The law of champerty does not require an obligation to pay the costs of the suit, or a contribution in cash to the expenses of the litigation, to constitute the offence; but professional or any other aid, in consideration of having a part of the subject or thing in controversy, is sufficient. (*Vide* opinion of Green, J., Backus *v.* Byron, Appendix B.) In this case, Cooper has made himself liable for all the costs, and assumed all the expenses, by taking a deed of the property, and instituting a suit in his own name. Surely the court will not hold that a champertor can elude the imputation arising in the case, by taking a conveyance and making himself plaintiff in a lawsuit which he prosecutes on shares. Champerty will have free course in Michigan if that can be done. The pains and penalties inflicted by the laws of that State on champerty, as a crime at the common law, (*vide* opinion of Green, J., Backus *v.* Byron, Appendix B,) will amount to nothing.

8. The principles here indicated are fully sustained by a recent decision of the Supreme Court of Michigan, (*vide* Backus *v.* Byron, Appendix B.) The opinion given by Judge Green recognises and establishes the following propositions:

1. That the common law on the subject of champerty is in full force in Michigan, and makes all contracts tainted with it void.

2. That it is not necessary to constitute the offence, that the party should obligate himself to pay the taxable costs of a suit, or to contribute to the expenses of the litigation in cash.

3. That champerty as a crime at the common law is to be visited with pains and penalties under and by virtue of a statute of that State. (Revision 1846, tit. xxx, ch. 161, sec. 22.)

The learned judge was the revisor of the statutes of 1846, and is likely to know whether the Legislature intended to set aside or abrogate the law of champerty. The positions assumed in Backus *v.* Byron are so ably reasoned and so thoroughly sustained by authority, that it will be superfluous to add another word on the general subject. (For many authorities, both English and American, not hereinbefore quoted, see the opinion of Judge Green.)

9. If there ever was a case calling for a rigorous application of that law, it is this. The Minnesota Mining Company were in possession of the premises in good faith, relying on the construction given to the act of 1847 by the authorities of the United States, without the slighest suspicion that Michigan could or would advance pretensions under the school-land

compact, and had made costly improvements on the same, when such premises were put up at auction at Lansing, behind their backs, and bid in for a song. Cooper must have been cognizant of all the facts. He knew the situation of the property, and that the claims of Bacon would meet with stern resistance. With his eyes open, after having consulted counsel, he deliberately entered into a copartnership of champerty with Bacon, and now asks the interposition of this court to enable him and his associate to realize the object and end of the corrupt arrangement. What is particularly aggravating in the case is, the certainty that Bacon could not secure his unjust acquisition by a suit in the name of Williams. His recent deed to the Minnesota Mining Company evinces pretty clearly what the course of the latter would have been, on being informed of the true character of the transaction. He would have arrogated equitable powers, and done justice to the parties.

10. If the deed from Williams to Cooper was void for champerty, then we have a perfect title, (even though we are overruled on other points,) by reason of the deed from Williams and wife to the company, of June 26, 1856, and it is submitted that the testimony offered should have been admitted, and the judgment below should be reversed for its exclusion.

The counsel for the defendant avoided a reargument of the points decided in 18 Howard, but upon the new matter made the following points:

Taking these facts in detail, the first question presented is, whether the deed from Williams to the Minnesota Mining Company was properly rejected.

This deed from Williams bears date since his deed to Cooper, and since the decision of this court affirming the validity of Cooper's title. The record also shows that Williams was a naked trustee of the legal title, and conveyed to Cooper, at the request of Bacon, who was in equity the owner of the land.

The subsequent conveyance, therefore, of Williams, without authority from Bacon, to the Minnesota Mining Company, who well knew the fact of the prior conveyance to Cooper, and the relation Williams sustained to the title, was in law a fraudulent act of both grantor and grantee, and could pass no title if his former deed was valid, and had conveyed the land to Cooper. (City of New Orleans v. De Armas, 9 Pet., 236; United States v. Arredondo, 6 Pet., 738.)

A grant is an extinguishment of the right of the grantor, and therefore he and all claiming under him are always estopped by the grant. (Fletcher v. Peck, 6 Cranch, 87; Terrett v. Taylor, 9 Cranch, 43; Pollard's Lessee v. Hogan, 3 How., 212.)

2. The next fact offered in proof in connection with said deed from Williams to the Minnesota Mining Company was, that said company when Cooper purchased was in possession of the land, claiming title to it, and that he before and at the time of the purchase knew of such claim and occupancy.

It is not necessary to consider whether at common law a deed would be void for maintenance which conveyed land in the adverse possession of another, since the statute law of Michigan expressly recognises the validity of such conveyance.

The following provisions having a bearing on that subject will be found in the laws of Michigan:

"Conveyances of land or any estate or interest therein may be made by deed signed and sealed by the person from whom the estate or interest is intended to pass, being of lawful age, or by his lawful agent or attorney, and acknowledged or proved, and recorded, as directed in this chapter, without any other act or ceremony whatever." (Revised Code of 1846, p. 262.)

"No grant or conveyance of lands or interest therein shall be void, for the reason that at the time of the execution thereof such lands shall be in the actual possession of another claiming adversely." (Page 263.) And at page 490, title Ejectment, is the following provision:

"It shall not be necessary for the plaintiff to prove an actual entry under title, nor actual receipt of any profits of the premises demanded, but it shall be sufficient for him to show a right to the possession of such premises at the time of the commencement of the suit, as heir, devisee, *purchaser*, or otherwise."

From these enactments it is plain that the possession of the Minnesota Mining Company, under claim of title and Cooper's knowledge of it when he purchased, cannot affect the validity of Williams's conveyance to him.

A short time prior to their passage, and which no doubt gave rise to them, the courts of Michigan had decided that a conveyance of land held adversely was void. (Buckner's Lessee v. Lawrence, 1 Doug. Mich. Rep., 38; Godfrey v. Desbrow, Walk. Mich. Ch. Rep., 266; Root v. Chapin, same vol., 79; Hubbard v. Smith, 2 Mich. Rep., 212.)

3. The remaining fact offered in proof in this connection was, that Bacon, being the owner in equity of the land, sold it to Cooper in trust for the National Mining Company, and that Williams, his trustee, by his direction, conveyed it to Cooper in trust for said company; and that he, Bacon, was also the owner of the whole capital stock of said National Mining Company, six-tenths of which he sold and transferred to Cooper, retaining the other four-tenths; and that when he took the conveyance of the land, he intended to bring suit against the

Minnesota Mining Company for the benefit of the National Mining Company; and before the conveyance was delivered to him by Williams, he, in conjunction with Bacon, applied to counsel to employ such counsel in such suit.

When the statute allowed a purchaser to take a conveyance of land in the adverse possession of another claiming title, it, as incident thereto and by necessary intendment, gave to the purchaser a right to use all lawful means to obtain possession. There are various lawful means of doing this, and by suit is one of them, which, in such case, is by far the most common. It would be going a great length to hold that he must not, at the time he makes the purchase, intend to use this means; that if he have such intention, the purchase will be void; that the intention to sue must be formed at some time subsequent to the conveyance. It is deemed a sufficient reply to this to say, that no such condition is found in the law which allows the conveyance to be made. Such condition would have rendered the statute almost a dead letter, and given rise to a contest about the *intention* of the purchaser in almost every case.

The Legislature must have well known that in most cases where land was in the possession of another claiming title, the occupant would contest his right by law; and, as a general thing, that the purchaser would be obliged to establish his claim in that way. It is therefore reasonable to presume, that if the Legislature intended to impose such restriction on the conveyance, it would have been expressed in plain language.

But it may be said, in reply, that it was not the intention of the Legislature to license champerty.

Champerty is a species of maintenance; and if it be understood to embrace a conveyance of land held adversely by another claiming title, then the answer is, that to that extent it has been rendered lawful in Michigan; but if it be understood in its original and primitive sense, as being "a bargain with a plaintiff or defendant to divide the land or other matter sued for between them if they prevail at law, the champertor to carry on the party's suit at his own expense," it will be admitted that it was not the intention of the Legislature to license it.

This presents the question, do the facts which the plaintiff in error offered to prove, amount to such a bargain?

Was it agreed that Cooper should divide the land, in case the suit prevailed? and if so, with whom? This is the first essential ingredient in champerty.

That he was not to divide it with Williams, the grantor, is certain, nor with Bacon, who was the equitable owner and real vendor, because the conveyance transferred the whole interest

in the land, both legal and equitable, to Cooper, in trust for the corporation called the National Mining Company. There was no agreement or promise that, in case the suit prevailed, or in any other event, either Cooper or the corporation should convey or give back to Bacon any part of the land.

Suppose Cooper, by direction of the National Mining Company, had, instead of bringing suit, immediately after the conveyance to him, sold and transferred the land to a stranger, would any promise to or agreement with Bacon have been violated? and if so, what promise?

Was there any agreement that, if the land was recovered, there should be a division of it between Cooper and the corporation for which he held it in trust? There was no proof of the kind offered. He held the naked legal title, and the corporation held the whole beneficiary interest in the land. In case of recovery, the whole beneficiary interest would belong to the corporation, and it could at any time compel him to convey the legal title to the company. In a word, he sues just as every other trustee sues, for the sole and exclusive benefit of the party owning the equitable estate.

There is then, in the proof offered, a total absence of a bargain that Cooper, or any one else, should divide the land sued for, or receive any part of the same as a consideration for carrying on the litigation, and that essential ingredient of champerty is therefore wanting.

Another essential ingredient to make a case of champerty is, that Cooper should have agreed to bring and carry on the suit, and that, too, at his own expense. (4 Black. Com., 135.)

He did not agree to do either of these things. The proof offered was, that he purchased the land in trust for the National Mining Company, and took the conveyance with the *intention* of prosecuting the title for the *benefit* of that corporation, and not for his own benefit. Was that intention obligatory upon him? Was he not at liberty to carry it out or not, at his pleasure? Did the proof offered show that he bargained to prosecute the suit at his own expense? Not at all.

Every trustee has a right, and it is oftentimes his duty, to sue in behalf of his beneficiary. In such case, unless there is proof to the contrary, the presumption is, the expense is borne by the beneficiary; and in this case the presumption as well as the fact is, that the expense is paid by the corporation.

Does the fact that Cooper owned a part of the stock in the corporation make the case on that account, so far as this question is concerned, any way different from what it would be if he held the title in trust for the corporation, and owned none of its stock?

The individual members or stockholders of a corporation are entirely distinct from the artificial body endowed with corporate powers. They may contract with each other, sue or be sued, as individuals; and for these purposes the members and the corporation are regarded by law as strangers to each other. In a word, they are wholly distinct beings. The one is a natural person, the other an artificial invisible being, which (with its faculties and capacities) is created by law. (Dodge *v.* Woolsey, 18 How., 344, note; Curran *v.* State of Arkansas, 15 How., 308; Waring *v.* Catawba Company, 2 Bay., 109; Pierce *v.* Partridge, 3 Met. Mass., 144; Hill *v.* Manchester Water Works, 5 Adol. and Ell., 866; Dunstone *v.* Imperial Gas Company, 3 Bac. and Adol., 125; Geer *v.* School District, 6 Vermont, 187, 18 Vermont, 405; Marine Bank of Baltimore *v.* Beays, 4 H. and Johns., 388; Angell and Ames on Corp., secs. 193, 390; 5 Ohio, 205.)

It follows, as a necessary consequence from these principles, that the fact that both Cooper and Bacon held stock in the National Mining Company, for whose benefit the conveyance of the land was made to Cooper, had no more influence, either in law or equity, upon the operation and legal effect of the grant, than if that stock had been held by a total stranger to the sale of the land.

If a party who carries on a suit has any interest, legal or equitable, or possibility of interest in the land which is the subject of the suit, there is no ground for the charge of maintenance. In other words, where there is a privity of estate, direct or indirect, present or remote, maintenance is justifiable. (Wickham *v.* Conklin, 8 John., 227; Wallis *v.* Pactland, 3 Ves., 503; 2 Ralls. Abr., 115; Bacon's Abr., title Maintenance, letter B.)

It is not deemed necessary to make further comment on the subject of champerty.

Mr. Justice GRIER delivered the opinion of the court.

Cooper, the plaintiff below, brought this action of ejectment to recover a part of section No. 16, in township 50 north, range 39 west, lying within the mineral district south of Lake Superior, in the State of Michigan. He claimed under the State of Michigan, and the defendant for the Minnesota Mining Company, under a right of pre-emption from the United States. The case was tried in the Circuit Court, and a verdict and judgment rendered for the defendants. On a writ of error to this court, the judgment of the court below was reversed, and the record remitted for further proceedings, in pursuance of the judgment of this court. The report of the case in 18 How-

Roberts v. Cooper.

ard, 173, exhibits a full statement of the facts, and of the questions of law arising thereon, as decided by the court, which it is unnecessary to recapitulate. On the last trial, the Circuit Court was requested to give instructions to the jury contrary to the principles established by this court on the first trial, and nearly all the exceptions now urged against the charge are founded on such refusal. But we cannot be compelled on a second writ of error in the same case to review our own decision on the first. It has been settled by the decisions of this court, that after a case has been brought here and decided, and a mandate issued to the court below, if a second writ of error is sued out, it brings up for revision nothing but the proceedings subsequent to the mandate. None of the questions which were before the court on the first writ of error can be reheard or examined upon the second. To allow a second writ of error or appeal to a court of last resort on the same questions which were open to dispute on the first, would lead to endless litigation. In chancery, a bill of review is sometimes allowed on petition to the court; but there would be no end to a suit if every obstinate litigant could, by repeated appeals, compel a court to listen to criticisms on their opinions, or speculate of chances from changes in its members. (See Sizer v. Many, 16 How., 173; Corning v. Troy Iron Company, 15 How., 466; Himely v. Rose, 5 Cranch, 515; Canter v. The Ocean Insurance Company, 1 Pet., 511; The Santa Maria, 10 Wheaton, 431; Martin v. Hunter, 1 Wheaton; and Sibbald et al. v. United States, 12 Pet., 488.)

We can now notice, therefore, only such errors as are alleged to have occurred in the decisions of questions which were peculiar to the second trial.

I. The first of these is an exception to the refusal of the court to permit the deposition of John Wilson to be read to the jury. This exception, though not waived, has not been much pressed, and cannot be supported. The deposition refers to no facts relevant to the issue. It tended to show that some of the officers of the land office and the Attorney General had expressed opinions on the questions of law arising in this case, different from those expressed in the opinion of this court. The practice of the land office and the opinions of the Attorney General may form very persuasive arguments to the court, but cannot be read as evidence to the jury of what the law is, or ought to be. It is the province of the court to instruct the jury as to the principles of law affecting the case, and counsel cannot appeal to a jury to decide legal questions by reading cases to them, or giving in evidence the opinions of public officers.

II. The only other exception to be noticed is founded on an offer of testimony overruled by the court, and an instruction refused, involving the same question. The evidence offered and overruled is as follows:

"The defendant then produced, and offered to prove, a deed of release from Alfred Williams and wife to the Minnesota Mining Company, dated June 20th, 1856, covering the lands in controversy; and further offered to prove, in connection therewith, that at the time when the said Cooper obtained the deed of the premises in controversy from Alfred Williams, the Minnesota Mining Company was in actual and open possession of the same, claiming title under their patent from the United States, and that the said Cooper knew of such claim and occupancy before and at the time of his purchase, and of said conveyance; that he obtained said title from Alfred Williams, he being the naked trustee of John Bacon, and that all the negotiations for the said purchase, and the purchase itself, were had between said Cooper and Bacon, the said Williams acting under the directions and for the benefit of said Bacon, and having or claiming no personal interest in said lands; that said purchase and conveyance were made for the following purpose, namely: that said Cooper should hold the same in trust for a corporation known as the National Mining Company, all of whose stock was held by said John Bacon; and by the conditions of said sale, the said Cooper was to receive, and did receive, with said conveyance, six-tenths of the stock aforesaid, and the said Bacon was to retain, and did retain, four-tenths of said stock. That the said Cooper purchased said stock and took said conveyance with a full knowledge of the claims and occupancy of the Minnesota Mining Company, and with the intention of prosecuting the title purchased by him, by legal proceedings in this court against the Minnesota Mining Company, for the benefit of the National Mining Company; and that before said conveyance was delivered to him by said Williams, the said Cooper, in conjunction with the said Bacon, applied to counsel in the city of Detroit to employ such counsel in the litigation aforesaid, which was to be had with the Minnesota Mining Company."

The deed to the Minnesota Mining Company was for portions of the land not demanded in this suit, and by itself was not relevant. The purpose and object for which this testimony was offered is not stated; but it could have no relevancy, unless to show the title to the plaintiff below to be void, because purchased and obtained with full knowledge of an adverse possession, and support the following instruction, which was refused by the court:

"The defendant further requested the court to charge the jury, that if, when said Williams conveyed to said Cooper the premises in question, the said Minnesota Mining Company was in actual and open possession of said lands, claiming title thereto under their patent, the said conveyance was void in law against the said company and all claiming under them; which instructions the court refused to give, and to this ruling the defendant excepted."

As the court had excluded the testimony offered to support this point of defence, the defendant could not expect that it would be submitted to the jury without evidence. We have therefore to inquire whether the testimony offered and overruled by the court ought to have been received to establish the defence of maintenance or champerty.

In this country, where lands are an article of commerce, passing from one to another with such rapidity, the ancient doctrine of maintenance, which makes void a conveyance for lands held adversely, is in many States entirely rejected. In some it has been treated as obsolete by the courts; in others it has been abolished by statute; while with some it appears to have found more favor.

The ancient policy, which prohibited the sale of pretended titles, and held the conveyance to a third person of lands held adversely at the time to be an act of maintenance, was founded upon a state of society which does not exist in this country. The repeated statutes which were passed in the reigns of Edw. I and Edw. III against champerty and maintenance, arose from the embarrassments which attended the administration of justice in those turbulent times, from the dangerous influence and oppression of men in power. (See 4 Kent Com., 477.)

The earlier decisions of the courts of Michigan seem to have adopted this antiquated doctrine as a part of the common law in that State. But so far as concerns its application to sales by one out of possession, the Legislature have annulled it. The Revised Code of 1846 (page 262) enacts that "no grant or conveyance of lands, or interest ther in, shall be void for the reason that at the time of the execution thereof such lands shall be in the actual possession of another claiming adversely."

From this enactment it is plain that the possession of the Minnesota Mining Company, under claim of title, and Cooper's knowledge of it when he purchased, cannot affect the validity of the deed of Williams to him. Although the testimony, which is the subject of this exception, was evidently offered with a view only to raise the question as above stated, the counsel for the plaintiff in error have endeavored to maintain in this court that the court below erred in rejecting it, because

if received it would have shown the contract between Cooper and Bacon, and the deed from Wilson, to be void for champerty. This offence seems to have been originated by the statutes passed in the time of Edw. I and Edw. III. (See 15 Viner's Abr., 149, tit. Maintenance.) It is defined (Hawkins's Pl., 84) as the "unlawful maintenance of a suit, in consideration of an agreement to have a part of the thing in dispute, or some profit out of it;" and by Chitty as "a bargain to divide the land (*campum partire*) or thing in dispute, on condition of his carrying it on at his own expense." In some States these statutes are held to be obsolete. But it seems that the case of Backus *v.* Byron (4 Mich. Rep., 535) has declared that they still retain their force in Michigan. That was an action by an attorney against his client on a contract, by which the attorney agreed to carry on a suit for a share of the land in case of success, and in case of failure to have nothing.

But in this case there was no offer to prove that Cooper had agreed to carry on the suit in consideration of receiving a share of the land in case of success; on the contrary, the offer was to show that he "purchased stock" in a mining corporation; that the legal title to the land was conveyed to him in trust for himself and the other stockholders; and as a consequence of the legal title being vested in him, the suit was necessarily brought in his name. It needs no argument to show that such a transaction has none of the characteristics of champerty, and that the court below was right in rejecting testimony which would not, if admitted, tend to show a valid defence, and was therefore wholly irrelevant.

The judgment of the Circuit Court is therefore affirmed, with costs.

Mr. Justice DANIEL:

Whilst I concur entirely in the conclusion just declared by the court, that the case now decided is in its features essentially the same with that of Cooper *v.* Roberts, formerly before us, and reported in the 18th of Howard, p. 173, I am unwilling to place my own opinion upon the fact of the identity of the two cases, irrespective of the reasons or principles on which the former of those cases was determined. That case was elaborately discussed by counsel; was, as the opinion of the court evinces, deliberately considered; the theory and objects of the system adopted by the Government for the distribution of public lands carefully examined, correctly expounded, and properly sustained by the decision. In the reasoning of the court, the cherished objects aimed to be secured by that theory, viz: the advancement of "religion, morality, and knowledge,"

as indispensable for the existence of good government, and for the happiness of mankind; the obligation for the maintenance of schools and the means of education as necessary for the ends proposed, as declared in the third article of the ordinance of 1787, are prominently and correctly set forth as guides in the interpretation and application of the policy and system of the Government in disposing of the public domain. It seems scarcely to admit of rational doubt, that it was in pursuance of this policy, and as deemed best calculated for its successful accomplishment, that in the surveys made or to be made of the public lands, the sixteenth section of every township, being central, (and therefore more than any other section could be,) connected with the several interests of the township, was appropriated for the use of schools. Admitting these to be the policy and theory of the Government, designed as it has been declared to lay the foundation of social and political good, it would seem to follow that nothing short of the highest and most overpowering public considerations, or an absolute inability or want of power, should be permitted to defeat or in any degree to control them. Surely speculations for private emolument, and still less such as might be attempted through the exercise of irregular or doubtful authority, should not be permitted to affect them.

The power vested in the President to reserve from sale such portions of land as he should deem necessary *for public uses*, may be classed as one of those paramount considerations, constituting a public or national necessity, reaching even to the defence of the country by fortifications or arsenals. In the same category may be placed the sanctimony of the rights of property and possession existing and vested in territories anterior to their acquisition by the United States; rights guarantied by treaty stipulations. In the same light may be viewed the withholding temporarily from sale lands in which were minerals and salt springs. All these restrictions or reservations are exceptions merely, and should be carried no farther than their terms expressly or necessarily require. They can with no propriety be regarded as forming in themselves a system; much less as overturning a system designed to be as far as practicable general and uniform, and proclaimed from its origin to be founded in wisdom and in a solemn sense of public good, and as such to be fostered and sustained. Every new State has come and will come into the Union relying on the faith of this pledge; and even upon the concession of a power in the Government to violate that pledge, such a violation could be referred to no principle of justice, and should therefore never be imputed but upon proofs the most positive and unequivocal.

The sixteenth section of each township could not, it is true, be specifically designated and possessed anterior to a survey of the public lands; but the right to that section and its appropriation existed in contract or pledge by virtue of the ordinance and the laws of the United States, and the right of possession and enjoyment was matured by the execution of the surveys. It cannot be supposed that this right, so important, was destroyed or impaired by an agreement for temporary occupancy, made without reference to any survey or division of the lands, made, too, without legitimate authority; nor can such right be affected by any ordinary allowance of pre-emption, because the pledge of the Government is pre-existing, is express, and therefore paramount.

The State of Michigan was admitted into the Union under the pledge given her by the general land system of the United States; her right to the sixteenth section of each township was under that pledge fully recognised. It could not therefore, consistently with good faith, be displaced by an arrangement irregular in its origin, and temporary in its character, in its tendencies and operation conflicting with a preceding, general, and beneficial system of policy. No effectual adversary rights could grow out of such an arrangement. Upon the views herein expressed, I am in favor of an affirmance of the judgment in this cause, not merely on the ground that this cause is essentially the same with that already decided between these parties, as reported in the 18th of Howard, p. 173, but also because the opinion of this court upon the law and the facts of the last-mentioned cause commands my entire approbation.