# HARRIETT McQUITTY v. R. L. WILHITE et al., Appellants.

### Division One, December 24, 1912.

1. **SPECIFIC PERFORMANCE: Testimony of Black Witnesses.**
The fact that the witnesses of the aged black woman who sues
for the specific performance of an oral promise of a white
man to give her forty acres of land, were black, and that. the
testimony of some of them was indistinct on dates and lacking
in precision, is to be taken in just relation with the other fact
that two experienced and learned trial chancellors have ren-
dered judgment in her favor based upon their testimony.

2. ————: **Oral Contract to Convey Land: Colored by Fact That
Illegitimate Children Were Born.** The fact that the plain-
tiff, a black woman, bore two children to the unmarried white
man who she alleges promised to give her forty acres of land
if she would remain with him until his death and perform
household duties, which she did, does not supply a legal con-
sideration for the contract, nor should it alone discredit the
contract or avoid it.

3. ————: ————: **Danger of Imposition and of Doing
Injustice.** While danger lurks in a case to specifically per-
form an oral contract to convey land after the promisor is
dead, and rigid rules govern and must be observed, yet the
court should also be alert to avoid the other danger of doing
injustice to a faithful and confiding promisee, from whom,
taking advantage of her ignorance and helplessness, the promisor
reaped performance, and while doing so procrastinated and
dallied with his promise and died without performance on his
part.

4. ————: ————: **Reasonable, Etc.** Where the oral agree-
ment to convey the land for services to be performed, is not
improbable; the amount of land claimed is not excessive when
compared with the amount of the promisor's estate and the
many years of peculiar service; there are facts to induce a
conclusion that the contract was likely to be made; the promisee
relied upon it, and performed on her part; and the services
contemplated by the contract were not to be readily recom-
pensed by mere money, and are referable to the contract, it
will be specifically performed.

Appeal from Boone Circuit Court.—*Hon. N. D. Thurmond,* Judge.

AFFIRMED.

*W. M. Williams* and *E. W. Hinton* for appellants.

(1)    The evidence was wholly insufficient to establish and contract whatever on the part of deceased to give or devise land to the plaintiff.    Forrester v. Sullivan, 231 Mo. 345; Collins v. Harrell, 219 Mo. 279; Wales v. Holden, 209 Mo. 552; Rosenwald v. Middlebrook, 188 Mo. 58; Kinney v. Murray, 170 Mo. 700. (2)    The proof fails to establish any definite contract or understanding, to say nothing of the one pleaded. Oliver v. Johnson, 238 Mo. 359; Collins v. Harrell, 219 Mo. 279; Rosenwald v. Middlebrook, 188 Mo. 58. (3)    There is no equity in the claim because it does not appear that the services were rendered because of the alleged contract and in performance thereof, or that there was any unjust enrichment impossible to compensate in money.    Collins v. Harrell, 219 Mo. 279; Berg v. Moreau, 199 Mo. 434; Rosenwald v. Middlebrook, 188 Mo. 93.

*J. L. Stephens* for respondent.

(1)    To deny specific performance would work a fraud and a hardship upon plaintiff and in equity and all good conscience, plaintiff is entitled to a decree of specific performance.    This contract and its fulfillment to the letter on the part of the respondent is irrefutable; sealed by the ties of flesh and blood. What stronger token or sign of a disposition on the part of the deceased to carry out an agreement could be made.    Nothing but death could or did prevent. The statements made by the deceased in regard to having given the respondent the forty acres of land described in the petition are clear and convincing, and

the reasons given therefor all go to show that the contract was made and that deceased was firm in his purpose to execute it on his part before death.   (2) Complete performance of a contract, though not in writing, by one of the contracting parties, takes the case out of the Statute of Frauds, and a parol promise to leave property in consideration of personal services is good under the same circumstances, and an action by bill in equity is proper to vest title in plaintiff.   Blees v. Jenkins, 129 Mo. 647; Suggets v. Carson, 26 Mo. 221; Self v. Cardell, 45 Mo. 345; McDonald v. Brayner, 63 Mo. 461; Winters v. Cherry, 78 Mo. 344; Carney v. Carney, 95 Mo. 353; McDermott v. Sharkey, 91 Mo. 647; Sutton v. Hayden, 62 Mo. 101; Wright v. Tinsley, 30 Mo. 389; Gupton v. Gupton, 47 Mo. 37; Berg v. Moreau, 199 Mo. 416; Healy v. Simpson, 113. Mo. 340; Nowack v. Berger, 133 Mo. 24; Alexander v. Alexander, 150 Mo. 579; Lyenn v. Hockaday, 162 Mo. 111; Hall v. Getman, 121 Mo. App. 630; Goodwin v. Goodwin, 172 Mo. 48.

LAMM, J.—Plaintiff, a black woman (well towards, if not over) eighty years of age, sues for performance in specie of a contract by one W. to convey to her forty acres of land, worth, say $2000.   From a decree in her favor, defendants, the collateral heirs of W. (now deceased) appeal.

The single question is whether the evidence supports the decree.

About the close of the Civil War plaintiff came to W.'s plantation in Boone county as his housekeeper.   He was then a widower and never remarried. He had an only child who died and left no offspring. We take it that at all times in hand he had a considerable plantation and subsequently added to it.   He ran his plantation solely with negro help, and if there were any white folks about him on the plantation it is not disclosed.   In 1877 he acquired a tract known

as the "Whiteside place," and it is a described forty acres of this tract that is the subject-matter of this suit. Plaintiff was about eighteen years old when she became such housekeeper. She seems to have been married, but when is dark, and so far as we can see her husband, to use a favorite phrase of Judge RAY, "cuts no figure in the case," and is a negligible quantity. W. died in 1905, a man of prominence, intestate and leaving a large estate.

In substance the petition charges that about 1878, W. promised plaintiff the land if she would remain with him until his death and perform the household and other duties enumerated in the petition. (The language of the petition is broad enough, when liberally construed, to cover a conveyance or a devise.) It further charges that plaintiff relied upon the promise, accepted it in good faith, entered upon the performance thereof and fully performed on her part. That at the close of his life, in pursuance of his promise, W. was about to make the conveyance but sickened and died without the opportunity. It is further alleged that plaintiff bore W. two children.

The answer was a general denial.

Plaintiff brought a prior suit in two counts. In one count she claimed a money recompense for services as housekeeper for over forty years. In the other she sued for specific performance, as in this suit. Cast below on the merits on the first count in the first suit she abided the judgment. Successful on the second count, the then defendants (administrators of W.) appealed. We reversed the judgment on the second count because the heirs of W. were not parties. [218 Mo. 586.] Thereupon she brought the present suit.

Plaintiff's uncommonly long-continued, manifold and singular services to W. are abundantly shown by the testimony. Practically the quantity and quality of her services are conceded by appellants. Defendants content themselves on that behalf by putting in

testimony tending to show that plaintiff received and contracted to receive four dollars per month for her services, together with one half the chickens, eggs and butter produced on the plantation, after deducting what was needed for the table. The extent of *table* demands or of her revenue from chickens, eggs and butter are only darkly indicated, but the latter seems at times to have amounted to something of substance. She seems also to have sold feathers, but whether she was the sole beneficiary of the feathers marketed is not so clear. She seems to have been deemed worthy to do some if not all of the marketing for W. in household supplies and to be put in charge of his extensive plantation in his absence, transmitting his orders to his black employees, looked after their observance and, *pro hac vice,* acting as overseer. That he had marked confidence in her integrity, capacity and disposition to serve him also appears. It is certain, too, that he planned to keep her by him and felt grateful to her. We get glimpses of her diligent faithfulness in her master's field, garden and dairy, for a life time. She lived in a tenant house in his dooryard, had the key to the smokehouse and farm supplies, was trusted to supply the men and report the items to her master. We take it she was his sole house servant, as such had charge of his house, and (in and about his household affairs and personal needs) did all, to use the language of the witness, "a woman could do." There is testimony that towards the end (that is, before W. died) she became crippled in his service, but there is nothing to show she did not live up to high watermark in quality of service as long as he lived. There is also uncontradicted testimony that she bore him two children, a boy and a girl, long since grown. But such sinister relation is not alleged, shown or claimed as a consideration for the contract sued on.

We shall not set forth the details of the evidence relating to the contract sought to be specifically performed. We give our own view of the tendency of it as it fell from the lips of the black people who testified for her. However, so far as we can discover, there were (as said) no white people on the plantation at any time who would be likely to know anything of the contract. To the contrary there was always a group of colored men cropping and working. Naturally the testimony would be looked for from them.

One testified that W. promised both him and plaintiff a home apiece if they would stay and work for him until he died. Plaintiff said she would stay, and did, but witness left in a couple of years. Afterwards he returned for a business purpose and, being invited to dinner by W., was addressed by him at table in these words: "Now, you see you have lost your home by not staying and filling out your contract as you agreed to . . . Harriett will get hers." Another testified he had a grievance against Harriett, we take it because she was giving him orders and exercising functions of an overseer over him. At that time W. was away from home, and one of the duties of this witness was to take W. on his trips from the plantation to the "gravel road" where he met the stage and to meet him at the same "forks of the roads" and bring him home on his return. On this occasion he met him at the stage road and W. inquired "how every thing was going on." Witness replied: "All right, except me and Harriett." Thereat W. admonished witness not to pay any attention to Harriett. He pointed out she was a privileged person by telling witness he had promised her forty acres of land on the Whiteside place, promised to fix her up well if she would live with him until his death. To accent her usefulness and his obligation to her while aiming to keep the peace on his plantation, by suggesting a de-

vice to that end, he continued: "Don't you pay any
attention to her, but just let on like you didn't hear
it." Another, John, who located the time at about
five or six years before the trial, related how W. met
up with him while making molasses, when Harriett
was helping. Noticing her tired gait, W. spoke of it
to witness and then spoke in praise of her. She has
done, he said, "a heap" of hard work, "she has been
worth more than two of his hands and has made more
for him than two of his hands." To that mead of
praise witness replied: "Harriett has done that good
for you and you ought to do the good part for her."
Thereto W. replied he was going "to fix a home for
her when he left her if she was the longest liver."
A son of plaintiff (and putative son of W.) testified
he heard W. chide the first witness for leaving him,
he had "lost out" by breaking his agreement to stay,
but Harriett had stayed and he had given her forty
acres, the northwest corner of the Whiteside tract.
There was testimony tending to show that in 1905,
just before W. took sick and died. he said he was go-
ing to town to have the papers fixed up for plain-
tiff. There was further testimony tending to show
that about that time he spoke to a neighbor about put-
ting in a foundation for a house on the northwest cor-
ner of the Whiteside land for Harriett. Once, many
years before W. died, plaintiff had left his plantation
and gone to Rocheport, as it appears, from what fol-
lows, because he had not fulfilled his promise up to
that time. She owned a little home in Rocheport of
small value—say, $150 to $200. Presently returning
temporarily and picking geese with a neighbor woman,
W. came to the tenant house in his front yard where
the plaintiff was and where she formerly dwelt. This
is what happened.

"Mr. (W.) come out from his house, out to Har-
riett's house and he set one foot upon the porch and
the other on the ground and his hand on the post and

said to Harriett. 'Harriett, where are all the boys?'' that is, his hands. Harriett said, 'They are all gone to work.' He said, 'I want to know what are you going to do?' She said, 'I am going to pick geese.' He said, 'I was not talking about that, I mean about coming back here.' She said, 'Mr. (W.), when I left here before you told me you would give me a home if I would come back and I come back, and I left this time with the calculation of not coming back unless you will give me a home.' He said, 'You don't know what I will give you.' She said, 'No, I don't know, but you have not told me so.' 'If you don't come back' he said, 'I am going to break up and board.' And Harriett said, 'You have the money to do it with.' He said, 'I know that, but I want to know what you are going to do.' He said, 'If you will come back and take care of me and my things the rest of my days I will give you a home as I first promised to do.' Q. Did he tell her what kind of a home? A. No, he said: 'I will give you a home and plenty to live on the rest of your days.' Q. You tell the court whether or not she came back? A. Yes, sir. Q. How soon? A. The wagon went after her that week.''

There was other testimony to the effect that W. had planned to build a house for Harriet on the land described in the petition and had long promised to give her the forty. So, too, it is plain from the proof that she relied on this promise with a full measure of childish confidence not unusual to those of the black race once in bondage. The way she performed the conditions of the promise on her part has been indicated.

So far as necessary the further tendency of her proof and that of defendants will be noticed further on.

Our conclusion on the whole case made is that the decree stands for affirmance. This, because:

The fact that plaintiff's witnesses were black and that the testimony of some of them was indistinct on dates and sometimes lacked precision is to be taken in just relation with another fact, namely, that two experienced and learned trial chancellors met those witnesses face to face in court, heard their testimony, listened to the sifting by the cross-examination of veteran and distinguished counsel, and (believing it) one followed the other in founding a decree thereon in favor of plaintiff. That plaintiff bore two children to W. would not supply a legal consideration for the contract. So much is clear. But the other half of that truth is this: Neither must that miserable fact alone discredit the contract or avoid it. While we have no call to moralize on that fact or found a decree on it, yet fortunately we need not permit it to interfere with doing justice to this old black woman, in the light of the pathetic and human story of this case. Courts are fond of referring to the danger lurking in this class of cases and to the rigid rules governing specific performance of parol contracts to convey real estate, when asked for after the death of the promisor. We are cited to cases of that character and have them in mind in our judgment. But the law of each case arises from the facts of that case. Agreeable thereto is the precept, *Ex facto jus oritur*.

There is another danger (one not to be ignored in equity) viz., that advantage may be taken of the ignorant, the confiding and helpless by those who promise, reap performance and then procrastinate, dally and die without living up to the Great Commandment of the law, to-wit: To do just and right and to render to every one his due.

There is nothing improbable in the contract in suit. The amount of land claimed, is not excessive when compared with the amount of the estate and the many years of peculiar service. So, there are facts in this record making it sure to my mind, beyond rea-

sonable doubt, that the contract was likely to be made and was actually made. This, to the credit of dece- dent. That the contract was relied on is clear; that plaintiff performed on her part cannot be gainsaid; that the contract contemplated services not to be read- ily recompensed by mere money is also clear. When the testimony is critically considered, in view of cir- cumstances existing, it is also clear that the services rendered were referable to the contract.

Something is made of the fact that decedent from time to time gave checks to plaintiff, but there was nothing shown in their amount or regularity that in any way militated against the contract in suit. We think the land promised is sufficiently indicated to per- mit performance in kind; and if some of the testimony is indistinct on that head, or any other, yet the cumu- lative force of all of it must be considered in the final result. It is not one drop, but constant drop- ping, that wears away a stone, as the proverb puts it. Furthermore, in weighing testimony no court is al- lowed to demand from an ignorant black man testi- mony rounded out with the clearness and precision to be expected of a witness capable of taking on and giving out the very clearest impression. It would in- deed be difficult to make a case of specific perform- ance, however meritorious, where the promisor is dead, if the humble witnesses who alone are likely to know the facts, as in this case, were required at every ut- terance to speak with professional precision. [Sut- ton v. Hayden, 62 Mo. l. c. 110.]

We stress the proposition that there are facts in this case that cannot be consistently accounted for except on the theory of the existence of the following facts: (a) a contract of the kind sued upon, (b) for the property in question, (c) reliance on that contract; and (d) performance on the part of plaintiff.

Our cases holding in judgment contracts of this character, when they formulate rules, but amplify the

doctrine Story put in a nutshell (2 Eq. Jur., 13 Ed., Sec. 764): "It is not only indispensable that the acts done should be clear and definite, and referable exclusively to the contract; but the contract should also be established by proofs to be clear, definite and unequivocal in all its terms." That pronouncement we have adopted (Alexander v. Alexander, 150 Mo. l. c. 597) and it is the sum of the matter. We find the facts here to come within that rule.

Something is made of the fact that the petition in the first suit laid the date of the contract at an earlier one than does the petition in this suit. At most that variance went to the credibility of the witnesses. Moreover, on dates, the illiterate rely unconsciously on correlated and associated facts to correct their almanac. So in a long, running transaction like this the subject-matter of the contract is likely to be often referred to, by those interested, in familiar discourse.

Decedent being bound in his life time, the failure to perform on his part calls for the interposition of a court of equity and requires that these defendants take this great estate charged with the burden of performing. In so decreeing we but do what they should have voluntarily done out of court from respect to their ancestor's memory.

Let the decree be affirmed. It is so ordered. *Graves, P. J.,* and *Woodson, J.,* concur; *Valliant, J.,* does not sit.