## CROMWELL et al. v. SIMONS.

(Circuit Court of Appeals, Second Circuit. January 18, 1922.)

No. 88.

1. **Wills** ⊙⇒58(2)—**Proof of intention of testator not sufficient to establish contract to make bequest.**

Evidence which tends to establish at the most nothing but an intention on the part of a testator to leave to another a specific sum of money by will is not evidence to support an allegation of an agreement to do so.

2. **Appeal and error** ⊙⇒1099(8)—**Court is bound by former decision as law of case.**

The decision of an appellate court in reversing a judgment for defendant, entered on a directed verdict, on the ground that plaintiff's evidence was sufficient to require submission of the case to the jury, becomes the law of the case, and on a subsequent review of a judgment for plaintiff, entered on a verdict based on the same evidence, the court is bound by its former decision.

In Error to the District Court of the United States for the Southern District of New York.

Action at law by Annie S. Simons against William Nelson Cromwell and Louis J. Cramer, executors of the will of Mrs Frank Leslie, deceased. Judgment for plaintiff, and defendants bring error. Affirmed.

Certiorari denied, 257 U. S. ——, 42 Sup. Ct. 463, 66 L. Ed. ——.

See, also, 262 Fed. 680.

Sullivan & Cromwell, of New York City, for plaintiff in error Cromwell.

Edgar T. Brackett, of Saratoga Springs, N. Y. (Edgar T. Brackett and Philip L. Miller, both of New York City, of counsel), for plaintiff in error Cramer.

---

⊙⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Roger Foster, of New York City (James A. Allen, of New York City, of counsel), for defendant in error.

Before ROGERS, MANTON, and MAYER, Circuit Judges.

ROGERS, Circuit Judge. This is an action at law to recover the sum of $40,000 upon three separate causes of action; the action being brought against the executors of Mrs. Frank Leslie, who died a widow and childless at the age of 78 years. The first cause of action alleged a promise made by the decedent to the plaintiff in 1902 to bequeath to her by her last will and testament a legacy in the sum of $50,000, whereas she left her no more than the sum of $10,000. The consideration for this promise, it is alleged, was the performance of certain personal services as nurse and companion for Mrs. Leslie. The plaintiff, it is alleged, was the cousin german of the testatrix. The second cause of action alleged a promise, in consideration of the services aforesaid, to pay to the plaintiff the reasonable value of the said services, which was the sum of $50,000, no part of which the decedent paid, except by a legacy of $10,000. The third cause of action was a promise, in consideration of the services aforesaid, to bequeath the plaintiff a sum equal to the reasonable value thereof, which was $50,000, whereas the decedent left the plaintiff only a legacy of $10,000.

This case has been in the Supreme Court of the United States, and appears in Ex parte Simons, 247 U. S. 231, 38 Sup. Ct. 497, 62 L. Ed. 1094. It was before the Supreme Court upon petition to that court for mandamus, or, if that should be denied, for prohibition or certiorari, to the District Court for the Southern District of New York. It appears that the District Judge, on motion of the defendants, ordered the first cause of action transferred to the equity side of the court and docketed as an equity cause, and to be stricken out of the complaint in the action at law, but only for the purpose of transfer, allowing the plaintiff to amend, etc. The ground disclosed was that by the law of New York the plaintiff could not sustain the first cause of action at law. The Supreme Court, in passing upon the application, said:

"We do not find sufficient ground for the opinion of the judge in the New York decisions. No doubt alleged contracts to make a provision by will must be approached with great caution in the matter of proof; but there is no doubt that, if proved, they are valid so far as no statute intervenes. So much seems to be assumed by the order of the judge, and is the law we believe of New York, as well as of other states and England. But, if valid, we see no reason why a contract to bequeath a certain sum should not give rise to an action for damages, if broken, as certainly as a contract to pay the same sum in the contractor's life, or at the moment of the contractor's death. * * * But we have seen nothing that suggests an arbitrary departure by the courts of New York from the common law in cases like the present. See Farmers' Loan & Trust Co. v. Mortimer, 219 N. Y. 290, 295; De Cicco v. Schweizer, 221 N. Y. 431; Silvester's Case, Popham, 148, 2 Roll. R. 104; Fenton v. Emblers, 3 Burr. 1279; Van Houten v. Van Houten, 89 N. J. Law, 301; Krell v. Codman, 154 Mass. 454."

The Supreme Court therefore held that the order of the District Judge was wrong, in that it deprived the plaintiff of her right to a trial by jury. The mandamus was accordingly granted requiring the Dis-

trict Court to give the plaintiff her right to a trial at common law. The case accordingly came on for trial before a jury in the District Court in January, 1919, and the plaintiff introduced testimony to support her case and rested. The defendants introduced no testimony. The defendants then moved for the direction of a verdict and the dismissal of the complaint, and for a nonsuit on the ground that the plaintiff had failed to make out a cause of action, on the ground that there was no evidence that would authorize the jury to find a verdict in favor of the plaintiff on any of the three grounds of complaint; and the court directed the jury to return a verdict for the defendants upon all three causes of action. In accordance with the instructions so given the jury rendered a verdict for the defendants.

The case was then brought to this court upon writ of error, and our decision is in 262 Fed. 680. This court reversed the judgment, and held that the evidence was sufficient to require the submission of the issue to the jury. From that conclusion the present writer, who participated in the decision, dissented, as appears from the printed copies filed in the clerk's office, but did not write a separate opinion. Through a mistake when the opinion came to be officially printed, the fact of his dissent for some reason did not appear. But the ground of his dissent was that the evidence seemed insufficient to establish a legal claim for the legacy or to warrant the submission of the question to the jury. His associates, however, thought the evidence was sufficient to justify its submission to the jury upon the first cause of action. The court added that—

"No doubt it would be proper to instruct the jury as to the care and scrutiny with which they should weigh the testimony, in view of all the circumstances of the case, but in our opinion the question was for them."

The case accordingly was tried again, and in March, 1921. This time it was submitted to the jury, and a verdict was rendered in favor of the plaintiff for $40,000, with interest. Judgment was accordingly entered in favor of plaintiff for $53,898.84. To sustain this judgment it must appear in the record that there was evidence from which the jury might find that Mrs. Leslie promised or agreed to bequeath to the plaintiff $50,000 in consideration of the performance by the latter of future services for the former. There is no direct evidence that any such promise was made. If there is any evidence on that subject, it is found in the testimony of the plaintiff's husband. His testimony was that he had a talk with his wife, in which she told him of a conversation which had occurred between Mrs. Leslie and herself, and that he then went to Mrs. Leslie and told her what his wife had told him as to the conversation she had had with Mrs. Leslie, and that he told Mrs. Leslie he was very glad and wished to thank her, because she meant to leave $50,000 to his wife. The following is an excerpt from his testimony on that subject:

"I know that Mrs. Leslie gave Mrs. Simons $10,000 by will, which she received. So far as I know, at that time there was no indebtedness of Mrs. Leslie; only that promise made. As I recall the language of what Mrs. Leslie said, I said, 'Florence, my wife tells me you expect to leave her $50,000 in your will, and I wish to thank you,' and her reply was, 'Robert, I am due

Annie for what she has done for me, rendering many services in my present condition, and I intend to call on her in the future.' That is the language about as near as I can remember it."

It is to be observed that this statement is not that the plaintiff represented that Mrs. Leslie had agreed or promised her that she would leave her $50,000 in her will, but only that she expected to leave her that amount, and that there was no statement showing that there was any consideration whatever therefor in anything the wife reported. And it is said that a recognition of a contract can be spelled out or inferred from what Mrs. Leslie replied to Simons when he informed her of what his wife had said. The fact is that Mrs. Leslie's comment did not refer one way or the other as to what she expected to do. But counsel continued:

"Q. And she said—your language was, 'I am told you intend to leave $50,000 for Annie,' I think you said? A. 'I intend to leave in my will $50,000.'
"Q. What? A. 'I intend to leave in my will $50,000 to her;' yes."

The witness had not so testified in this case until counsel put the words into his mouth. Then he said that Mrs. Leslie told him that she intended to leave $50,000 for Annie in her will. His subsequent examination, however, shows that he was putting his own construction or interpretation on her words throughout. When the case was here before, this court quoted the testimony of Simons as to what he said to Mrs. Leslie and what she replied to him:

"I said, 'Cousin Florence, my wife tells me that you are going to leave her $50,000 in your will, and I wish to thank you for it.' Her reply was, 'Robert, I am due Annie that money for what she has done in many services rendered to me in my present condition, and I intend to call on her in the future.' "

The court said:

"This testimony, if believed, was evidence that the decedent had admitted a conversation with the plaintiff as to her services rendered and to be rendered, and as to the compensation to be paid for them in the decedent's will. A jury might find it to be, not language of expectation or intention, but of agreement. The details necessary to establish a contract appear specifically; the consideration, the amount, and manner of compensation are all stated. The decedent, perhaps in not technical language, but substantially, stated to the witness the consideration, viz. that there was 'due' by her to Annie the sum of $50,000 for services rendered in the past and for which she was going to call in the future. These services had been and were subsequently rendered by the plaintiff."

It is said that Mrs. Leslie's reply to the statement made to her might be regarded by the jury as an admission of the fact that she had promised Mrs. Simons to leave her $50,000 by her will. In the law of evidence an admission is a voluntary acknowledgement by a party of the existence of the truth of certain facts. But an admission arising from a failure to deny an assertion by a third person cannot be broader than the assertion made. If in this case Simons had said that his wife had told him that Mrs. Leslie had promised or agreed to leave her $50,000 by her will, there might be force in the suggestion that the jury might infer the fact of the promise. But that was not this case.

If the testimony of the husband at the second trial neither added anything to or took anything from what he testified to at the first trial, we should be, of course, concluded by the decision of this court when the case was here before, and should be obliged to hold that the question was one for the jury. At the second trial the cross-examination shows that the witness was putting his own construction or interpretation on what was said. He was asked whether Mrs. Leslie said she had agreed to give anything to Mrs. Simons. The witness avoided a direct answer to that question repeatedly put to him. Finally the court took the witness in hand, and the following occurred:

"Q. Did she say she had agreed to give your wife anything in her will? A. Yes; agreed to give her $50,000.

"Q. Have you ever on either trial up to this moment sworn that she said she had agreed to give Mrs. Simons anything? A. That is the interpretation.

"Q. Answer the question, Mr. Simons. A. There is my answer here.

"Q. Up to this moment? A. That is my answer.

"Mr. Foster: I submit that is a proper answer. That is the object of the question.

"The Court: Really, Mr. Foster, you must not interrupt the cross examination so frequently. It makes it quite impossible for the cross-examiner to proceed.

"Q. Have you ever, Mr. Simons, on either trial up to this moment, testified that Mrs. Leslie said she had agreed to give anything to Mrs. Simons A. Because I never was asked before. This is the first time I was asked it.

"Q. Did you testify a few minutes ago that you had given all that was said on the conversation? A. I interpreted that as 'agreed.'

"The Court: You see the difficulty is this: He asked you whether she said she agreed.

"The Witness: Just what I said, Judge; she said that.

"The Court: I cannot hear you.

"The Witness: I say, that is what she said to me.

"The Court: Did she use the word 'agreed'? That is the point.

"The Witness: Not the exact word 'agreed,' but I interpreted it to mean that way.

"The Court: That is not what he was getting at. He wanted to know whether she said she agreed. Did she use the words, 'I agree'?

"The Witness: No; she used exactly what I put there.

"Q. And nothing else in that regard? A. That is all that she said.

"Q. And you interpret the language 'I am due Annie that' as meaning that she had agreed to give it? A. She expected to give.

"Q. That she expected to give?

"Mr. Foster: I object to the interpretation, if your honor please.

"The Court: No; in cross-examination I cannot hold it quite so close. You may go on, Senator Brackett. This is the crux of the case, and he is entitled to great latitude.

"Q. And you have interpreted what you have given here on the stand as meaning that she had either agreed or expected to give? A. Intended to give.

"Q. $50,000? A. Yes.

"Q. Or intended to give $50,000 by her will? A. Yes; by her will.

"Q. Although she did not in the conversation use either the words that she had agreed to give, or that she intended to give, or that she expected to give, either one of those three interpretations? A. Just what she said, 'I intend to remember her in my will.'

"Q. She said, 'I am due Annie that for the many services she has rendered to me, and I am going to call on her for more'? A. Yes.

"Q. Did she use the word 'agree' in that conversation? A. I have said no.

"Q. Or 'intended'? A. Just as I have said here.

"Q. Did she use the word 'intended' in the conversation? A. What do you think (os) anyway?

"Q. Did she use the word 'intended'? A. Now, I said exactly all that I can remember about it. That is exactly what she did, and I am not going to deviate from it. That is my instruction—that is my construction of it.

"Q. I am asking you, did she use the word 'intended'? A. It is not there, is it?

"Q. What? A. It is not there. She didn't use it then.

"Q. Did she use the word 'expected'? A. It is not there.

"Q. When I have used the past of the words 'expected' or 'intended,' did she use the present of either of them? A. She had promised to leave it by her will.

"Q. Did she use the word 'promise'? Answer that by 'yes' or 'no.' I do not mean to be unfair. A. I know that, but you are asking such questions.

"Q. Did she use the word 'promise,' Mr. Simons? A. I thanked her; I said, 'I want to thank you.'

"Q. Did she in that conversation? A. 'My wife tells me you have promised to leave her.' That is what my wife said to me.

"Q. Did she use in that conversation either the word 'promise' or the word 'promised'? A. That her reply to me was, 'I am due Annie that money.'

"Q. Then, Mr. Simons, you mean by your answer that she did not use the word 'promise' or 'promised'? A. What other interpretation would you give it?

"Q. I am not giving the interpretation. I am giving a use of a particular word. Did these words pass her lips in that conversation, 'promise' or 'promised'? A. That she intended to do.

"Mr. Brackett: I move to strike that out.

"The Court: Yes; but it is not of any moment to continue that any further. He sticks to the words, and the words speak for themselves. Of course she didn't use the word 'promise,' because he says that is all she did use."

The testimony now shows that Mrs. Leslie did not say that she had agreed to give Mrs. Simons anything, or that she intended or expected to give her $50,000 in her will, or had promised it. This is entirely new testimony, and counsel claims differentiates the evidence in the second trial from that given at the first. The evidence on the first trial left the possible inference that Mrs. Leslie had agreed or promised to leave Mrs. Simons $50,000 in her will. The court does not agree that any such inference could properly have been drawn from the evidence at the first trial. But, if it could have been, this new evidence, given at the second trial, would not preclude the inference still being drawn. All that we have, however, is the husband's testimony that his wife told him that Mrs. Leslie was "going to leave her $50,000" in her will. Such language as this, this court said, when the case was here before, of certain like testimony relied upon to support the third cause of action, "is not the language of contract, but of pure intention or expectation, quite insufficient to prove an agreement to bequeath to the plaintiff a sum" of money. Mrs. Leslie's alleged reply, when she was told by Simons what his wife had reported to him was:

"Robert, I am due Annie that money for what she has done, rendering many services in my present condition, and I propose to call on her in the future."

So far as Mrs. Leslie's words go, they are evidence of an acknowledgement of an existing present indebtedness, and nothing more. They are not evidence of an acknowledgement of an indebtedness to be paid by a provision in her will. And the record is barren of any evidence

that Mrs. Leslie agreed or promised to leave $50,000, or any other sum, to the plaintiff by will. The allegation of the complaint was as follows:

"XII. In consideration of the performance of the said services by plaintiff as aforesaid, and of plaintiff's continuance in the performance of the same, said Mrs. Leslie promised to bequeath to this plaintiff by her last will and testament a legacy of the sum of $50,000. Said promise was made in or about the month of February, 1902, and was repeated on subsequent occasions. In consideration of said promise the services hereinbefore set forth were performed by plaintiff."

So far as Mrs. Leslie's words constituted an acknowledgement of an existing indebtedness the claim was hopelessly outlawed by the stattue of limitations before the action was brought, the statute having been pleaded in the answer; and it sufficiently appears to point out that the plaintiff did not tell her husband that Mrs. Leslie had agreed or promised to leave her $50,000 by will. His testimony was that his wife told him that Mrs. Leslie was "going to leave" her $50,000 in her will.

The complaint, as stated at the beginning of this opinion, set forth three causes of action. The court below, however, dismissed the second and third counts, on the ground that there was no evidence to support them. The case went to the jury on the first count alone. That count alleged a promise to bequeath by will to the plaintiff the sum of $50,-000. Under that count it was necessary that the jury should find that such a promise or agreement was made. The court below charged the jury that—

"The question here is not—as has been well said to you by counsel—any promise that Mrs. Frank Leslie made to Mr. Robert Simons at that time, for that would not be a contract, or at least the contract which we are suing on here; but the question is whether, when Mrs. Frank Leslie used those words in respect to what Mr. Robert Simons said to her, these words are sufficient evidence of a contract made earlier on that day, I think, or, if not, the day before, between Mrs. Frank Leslie and the plaintiff. Therefore you must find out what the contract was from the admissions that Mrs. Frank Leslie made at that time to the plaintiff's husband, and from the general setting of the parties at the time when the words were uttered. So you see that you must necessarily determine the case by what you think to be the reasonable inference from the language of the parties, and the circumstances in which they found themselves at that time."

The issue was correctly stated in the charge. If there was any evidence from which the jury could properly find that such a promise was made, the court was right in submitting the matter to the jury; but, if there was no such evidence, the case should not have gone to the jury, had it not been for the decision of this court when the case was here before. Simons' testimony was not that he told Mrs. Leslie his wife had informed him that Mrs. Leslie had promised to leave her $50,000 in her will, but that she "expected" to leave her that amount. He did not testify that Mrs. Leslie admitted or denied that she "expected" to leave his wife any amount by will. It was simply:

"I am due Annie for what she has done for me, rendering many services in my present condition, and I intend to call on her in the future."

And on his cross-examination he was compelled, as we have seen, to admit that Mrs. Leslie did not say that she had "promised" or "agreed," or even "intended" or "expected," to give his wife $50,000 by her will. So that the question comes to this: Can a jury infer that Mrs. Leslie had promised to leave Mrs. Simons $50,000 in her will because, when informed that his wife had told him that she expected to leave her that amount, she made the reply above quoted? The only possible deduction which a jury could be entitled to draw from this conversation between Simons and Mrs. Leslie would be one of the following inferences:

(1) That Mrs. Leslie recognized a moral or legal obligation resting upon her to pay Mrs. Simons the amount of money mentioned and that the sum was then "due." But that inference, if drawn, would not support the present suit as a cause of action for money then due, inasmuch, as already pointed out, such an action was barred by the statute of limitations.

(2) That Mrs. Leslie "expected" to leave Mrs. Simons $50,000 in her will, because of many services that individual had rendered her, and that she intended to call on her in the future. But there is no evidence of anything more than that Mrs. Leslie "expected" to do this. The jury could not infer a promise or an agreement from this statement of Mrs. Leslie's expectation, and particularly could not do so in the absence of any evidence that Mrs. Simons rendered services thereafter in reliance upon this expression by Mrs. Leslie as to what her expectation was, and the further fact that Simons was compelled to admit that Mrs. Leslie did not use the word "promised" or "agreed," or "intended" or "expected," to give her $50,000 by her will. Neither is there any direct evidence that Mrs. Simons, the plaintiff, understood the alleged conversation she had with Mrs. Leslie to be an offer, and rendered her services to Mrs. Leslie in acceptance thereof.

(3) That Mrs. Leslie, at the time the conversation occurred, expected to leave Mrs. Simons $50,000, but subsequently changed her intentions for reasons satisfactory to herself, and reduced the amount to $10,000.

[1] Evidence which tends to establish at the most nothing but an intention on the part of a testator to leave to another a specific sum of money by will certainly is not evidence to support an allegation of an agreement to do so. Reilly v. Burkelman, 149 App. Div. 548, 550, 134 N. Y. Supp. 13; Hoffman v. Condon, 134 App. Div. 205, 118 N. Y. Supp. 899; Wildman v. Jones, 150 App. Div. 514, 135 N. Y. Supp. 428; O'Brien v. Foley, 150 App. Div. 257, 259, 134 N. Y. Supp. 825. While it is true that the mere statement of intention is not proof of a contract or binding obligation, we do not overlook the cases which hold, and no doubt correctly, that a statement of intention may, because of attending circumstances, which give the other party a right to act upon it as an intended offer afford the basis of a binding agreement. In 40 Cyc., after stating that a person may make a valid contract to dispose of his property by will in a particular way, provided it is clearly established by the testimony of disinterested witnesses, if in parol, it is said at page 1065:

"However, mere statements, oral or written, of an intent to give property by will to another, do not amount to a contract to do so. * * *"

In Armstrong's Administrator v. Shannon, 177 Ky. 547, 550, 197 S. W. 950, 951, the Kentucky Court of Appeals in a late case said:

"Perhaps Mr. Armstrong intended to make a will devising his property to his niece and nephew. However that may be, no such instrument was executed, and the courts are without power to make one for him. To recover in a case like this, the claimant must show an express agreement and promise to pay; an implied promise will not support such a claim. The rule is well stated in the case of Bolling v. Bolling's Adm'r, 146 Ky. 316, where it is said: 'In a long line of decisions this court has held that, where the relationship of the parties was sufficient to raise the presumption that they lived together as a matter of mutual convenience, the law will not imply a promise to pay for the services so rendered. On the contrary, an express contract must be proven, and to establish such a contract stricter proof is required than in a case of an ordinary contract.' While this rule has generally been applied in cases between parent and child, brother and sister, it has also been extended to uncles and aunts on the one side, and nephews and nieces on the other. Wier v. Wier's Adm'r, 3 B. M. 645; Bolling et al. v. Bolling's Adm'r, 146 Ky. 316; Ballard v. Ballard, 177 Ky. 260."

In Nicholls v. Hodges, 1 Pet. 562, 566, 7 L. Ed. 263, a claim was made for services rendered by a nephew to his uncle, who had served as a clerk in his store for three or four years. The case came before the Supreme Court on an appeal from the Circuit Court in the District of Columbia. Mr. Justice Duval, speaking for the court, said:

"It is in proof * * * that it was distinctly understood between them that the testator had agreed to pay his board, to find him in clothing, and to pay his expenses generally; that it was customary among merchants to take young men, of a certain age, for their board and clothes; that the uncle had said that at a future day he intended to take him into partnership with him; and it was proved that the testator, at the time of making his will, observed that he had given his nephew a legacy as a consideration for his services, and that he had always intended to give him something. It is not denied that the testator had fully complied with his engagement to pay his board, supply him with clothes, and pay his expenses. On this testimony the claim rests The evidence is too defective to require comment. It is the opinion of this court that it is too loose and indeterminate to sanction the claim, and it cannot be allowed."

If we concede that the relationship between Mrs. Simons and Mrs. Leslie—that of cousins german—was not sufficient to raise the presumption that they were living together as a matter of mutual convenience, and that the law would raise an implied promise to pay for the services so rendered, it is enough to say that the cause of action in the case at bar was not an implied promise which was barred by the statute of limitations, but upon an express promise, and that the express promise could no more be inferred from Mrs. Leslie's statements of her intentions than one could be inferred in the Shannon Case.

In Van Horn v. Demarest, 76 N. J. Eq. 386, 388, 77 Atl. 354, 359, Vice Chancellor Stevenson said:

"The declaration of testamentary intentions and purposes, even when the beneficiary of those intentions and purposes acts upon such declaration to his injury, does not necessarily constitute a contract."

It is sometimes said that the rule in this class of cases required a case to be proven by the clearest and most convincing evidence, and that the

courts look upon cases of this nature with suspicion, and that they must be establishesd by the testimony of absolutely disinterested witnesses. Thus in Rosseau v. Rouss, 180 N. Y. 116, 120, 72 N. E. 916, 918, Judge Vann, speaking for the Court of Appeals in a case of this nature, said:

"Thus the evidence relied upon to establish the contract is, first, the testimony of the mother, who tried to swear $100,000 into the pocket of her own child; and, second, the testimony of witnesses who swear to the admissions of a dead man. The former is dangerous, the latter is weak, and neither should be acted upon without great caution. We have repeatedly held that such a contract must not only be certain and definite, and founded upon an adequate consideration, but also that it must be established by the clearest and most convincing evidence. We have been emphatic in condemning these agreements, because they 'have become so frequent in recent years as to cause alarm.' We have been rigid and exacting as to the sufficiency of the evidence to establish them, and have condemned the proof thereof 'through parol evidence given by interested witnesses.' As 'such contracts are easily fabricated and hard to disprove, because the sole contracting party on one side is always dead when the question arises,' we have declared that they 'should be in writing, and the writing should be produced, or, if ever based upon parol evidence, it should be given or corroborated in all substantial particulars by disinterested witnesses.' Hamlin v. Stevens, 177 N. Y. 39; Mahaney v. Carr, 175 N. Y. 454; Ide v. Brown, 178 N. Y. 26; Edson v. Parsons, 155 N. Y. 555; Shakespeare v. Markham, 72 N. Y. 400."

It is very possible that in this class of cases courts have sometimes indulged in statements which, if unexplained, may easily be misunderstood and misapplied. We take it to be true that in civil cases a plaintiff is not only required to prove his case by a preponderance of evidence, but that the evidence should be clear and convincing. See McKeon v. Van Slyck, 223 N. Y. 392, 397, 119 N. E. 851. It is also true that a jury must always be the judges of whether the evidence is clear and convincing. We think it is the rule, supported by well-considered cases, that in actions of this sort very clear, strong, and convincing testimony should be required, but that the right to determine whether the evidence in any particular case fills these requirements is one for the triers of the facts to determine. Fitzpatrick v. Graham, 122 Fed. 401, 58 C. C. A. 619, which was decided by this court.

But, while this is the law, it is also equally well established that, if there is no evidence whatever in support of a plaintiff's claim, there is nothing to submit to the jury, and if such a case is submitted to the jury, and a verdict is rendered which there is no evidence to support, the judgment should be set aside. That a jury finds a verdict which there is no evidence to support sometimes happens, and the instances are not rare where appellate courts have been compelled to set aside judgments for that reason. That the jury in this case found for the plaintiff, after being instructed that they could not find such a verdict unless they found that an express promise had been made, is not convincing or conclusive that the evidence before them warranted their verdict.

The record is chiefly occupied with testimony as to the personal services rendered by the plaintiff to Mrs. Leslie for a number of years. This testimony would have been of importance, if the issue involved the right to recover on a quantum meruit, but on the real issue which

the jury was allowed to determine it shed no light. It is possible that the testimony as to these services influenced the jurors in the conclusion which they reached, notwithstanding the effort made by the trial judge in his charge to guard against it. At the beginning of his instructions he said:

"* * * It is always possible in a group of 12 men to go outside the case, and you may be disposed to decide it by considerations which are quite foreign to those that the law recognizes. For example, it is possible that the disposition of some of you, at least, will be to say that this was a rich old lady, and this plaintiff was a cousin, and she did not treat her cousin very kindly or very generously; that she had received a good deal from her in the past, and she had been courteous to her, and that she had received rather crabbed treatment; and that on the whole it is only a decent thing that she should have received $50,000, instead of $10,000.

"It is quite true, since we preserve the jury system, that there is no way by which we can prevent juries from taking that attitude in cases of this character. Yet I think you will observe (in so far as this seems to you a desirable thing) that the property of the individual should be divided in accordance with the law, and not in accordance with the generosity of 12 men who do not own it. It is of vital consequence that you should not adopt that attitude toward the case, but that you should attempt to decide it upon the issues which the law says are controlling.

"This is merely by way of caution which I feel bound to give you at the outset, not, of course, because I have any acquaintance with you, or think that any one of you has that disposition, but only because I think at times that is the disposition of all of us, particularly when we get together and talk collectively, and perhaps without time for reflection, which we otherwise might have when we might deliberate upon it alone. I think that under those circumstances it is possible that you may be disposed to disregard the very narrow issues of fact which I shall explain to you presently, and simply decide the question of what you suppose to be the general equities of the situation. In so doing you would not be in fact disposing of the matter according to the equities of the situation, unless you are prepared to go so far as to say that the general equities entitle 12 men who know nothing about the parties to take away the property from one person and give it to another person for reasons that the law does not recognize. Therefore, so far as you do it, you will deny to this old lady who is dead the right to dispose of her property in her own way, a right which I think you in your own circumstances would feel to be a very substantial right, as to which you are entitled to the protection of the law and not to the intervention of 12 men, who happen to have power to dispose of it otherwise than as the law permits."

He then referred to the history of the relations which existed between the plaintiff and Mrs. Leslie and said:

"Some time in March of 1902 took place the transaction between the two which is the contract relied on, and it is the transaction which occurred at that time which is the only talk or communication on which a contract can be based in this case, and on which the plaintiff can recover."

And he continued:

"If you do find that that was true, and then if you find that Mrs. Simons, relying on that promise given to her, continued to perform the services intended, the contract was made, and the contract was performed; but unless you do find that, if your minds are in doubt as to whether any such thing occurred, then you cannot bring in a verdict for the plaintiff, but must bring in a verdict for the defendant. That is a question of fact. On that question of fact the case turns, and on no other question of fact."

The charge was correct, and the testimony as to the services rendered under the issue on the pleadings became important only if the

jury thought the promise had been made. It was not evidence to establish a promise, but evidence that, if the promise was made, the plaintiff fulfilled her part of the agreement by rendering the future services which constituted the consideration for the promise.

I am authorized by Judge MAYER to say that he fully concurs in the views expressed herein that there is no evidence whatever that any promise or agreement was ever made by Mrs. Leslie to Mrs. Simons that she would leave $50,000 to her by will, and therefore that there was no question to be submitted to the jury under the cause of action pleaded.

[2] The majority of the court, as constituted at the present hearing, are convinced that the conclusion reached on the first hearing was erroneous, and one of the majority dissented at that time and the other of the two was not then a member of the court. The majority of the court as constituted at the former hearing took an exactly opposite view; one of that majority still sitting and adhering to the conclusion he then reached, while the other has since retired from the court. This change of personnel in the court, although it changed the minority view of the former hearing into the majority view at this hearing, does not in itself warrant the court in disregarding "the law of the case" as it was determined by the court when the case was here before. So far as this court's relation to the case is concerned, we recognize the rule that the former decision, under well-established law laid down in a multitude of cases extending over a long period of years, settled the question as between these immediate parties to this litigation. "Res judicata inter partes jus facit." The rule is undoubtedly based on sound considerations of public policy which we would not be justified in disregarding.

In Johnson v. Cadillac Motor Car Co., 261 Fed. 878, 8 A. L. R. 1023, this court declined to be bound by the decision rendered by the court when the same case was here on a former occasion, and we reversed the judgment obtained at the second trial, which involved only a fifth of the amount which is here involved. We have no desire to discredit in the least the decision then made, or to depart from the principle then laid down. That principle was that, under exceptional circumstances, where a former decision in the same case is clearly erroneous, and announces a wrong rule and one mischievous in its practical operations, or which might readily affect many persons adversely, the court should reverse its earlier decision.

It is not probable, and certainly cannot be foreseen, that exactly such a state of the evidence, as in the case now before us, will be presented again in some subsequent litigation. After the first decision in Johnson v. Cadillac Motor Car Co., it transpired that the New York Court of Appeals decided Macpherson v. Buick Motor Co., 217 N. Y. 382, 111 N. E. 1050, Ann. Cas. 1916C, 440, L. R. A. 1916F, 696, which established the law of the state in a manner contrary to the rule first announced. While we arrived at our conclusion quite independently of that decision, which was not controlling upon this court, the attitude of the New York court was of great importance. And in the case at bar, since the earlier decision, there has been no decision of the Supreme

Court of the United States or of the New York Court of Appeals having any bearing upon the question before us.

The Johnson v. Cadillac Motor Car Co. Case is clearly exceptional, and is easily distinguishable from the case now before the court. In the instant case, when it was here before, no rule or principle of law was laid down which can affect adversely other persons than those before the court; the only question being as to whether the particular evidence produced at the trial justified the submission of the case to the jury.

The majority of the court which heard the case on the second writ of error have felt it their duty, however, to state fully and frankly their view of the law, and to point out wherein and why we differ from the decision rendered when the case was here before. We may be in error, or the majority of the court at the former hearing may have been in error; we are certainly not both right. It may be that the learned counsel who argued this cause may still find in this unusual situation, involving as it does a considerable amount of money, some way of ascertaining which of these conflicting views is correct. But, however that may be, we have no alternative, and the judgment must be affirmed.

MANTON, Circuit Judge (concurring). On this writ the plaintiffs in error seek review of a judgment recovered on a cause of action resting on a promise made by the decedent, Mrs. Leslie, to the defendant in error in 1902, in consideration of personal services theretofore and to be thereafter rendered by her to bequeath her a legacy of $50,-000, whereas Mrs. Leslie bequeathed her a legacy of only $10,000. The right to a jury trial of the basis of this claim and the sufficiency of the complaint was upheld in Ex parte Simons, 247 U. S. 231, 38 Sup. Ct. 497, 62 L. Ed. 1094. This court reversed a judgment for plaintiffs in error upon a directed verdict, and held that on precisely the same proof offered on this trial, the question of whether there was an agreement or contract was for the jury. It was held that the details necessary to establish the contract appeared specifically—the consideration, the amount, and the manner of compensation. Simons v. Cromwell (C. C. A.) 262 Fed. 680. Overwhelming authority requires the law of the case, as thus declared, should be followed:

"It is the settled law of this court, as of others, that whatever has been decided on one appeal or writ of error cannot be re-examined on a second appeal or writ of error brought in the same suit. The first decision has become the settled law of the case." Thompson v. Maxwell, 168 U. S. 451, 18 Sup. Ct. 121, 42 L. Ed. 539.

"The decree having been formally rendered in this cause, the court is now to determine whether that decree has been executed according to its true intent and meaning." Himely v. Rose, 9 U. S. (5 Cranch) 313, 3 L. Ed. 111.

On a second writ of error, the court cannot be compelled to review its own decision on the first. Roberts v. Cooper, 61 U. S. (20 How.) 467, 15 L. Ed. 969. There Justice Grier observed (61 U. S. 481, 15 L. Ed. 969) :

"To allow a second writ of error or appeal to a court of last resort, and on the same questions which were open to dispute on the first, would lead to

endless litigation. * * * There would be no end to a suit, if every obstinate litigant could, by repeated appeals, compel a court to listen to criticisms on their opinions, or speculate on chances from changes in its members."

See the same rule applied in the various circuits. Development Co. v. King, 170 Fed. 923, 96 C. C. A. 139; Linkous v. Va. Ry. Co., 242 Fed. 916, 155 C. C. A. 504; Woodruff v. Yazoo Co., 222 Fed. 29, 137 C. C. A. 567; Standard Co. v. Leslie, 118 Fed. 557, 55 C. C. A. 323; U. S. Press Ass'n v. Natl. Newspaper Ass'n, 254 Fed. 284, 165 C. C. A. 572; Nat. Bank v. U. S., 224 Fed. 679, 140 C. C. A. 219.

In Johnson v. Cadillac Co. (C. C. A.) 261 Fed. 878, 8 A. L. R. 1023, the writer of the majority opinion devoted some six printed pages to this subject, and recognized the full force and effect of the doctrine of stare decisis. The law of this case between the parties, having been settled on the former appeal, makes the law of the case in this respect res adjudicata.

Nowhere in the consideration of the evidence is error pointed out. Nor was mistake made in our former consideration of the case. The complaint in the majority opinion rests, not on the rule of law, but on the question of fact. The evidence was sufficient to require its submission to the jury to say whether a contract was proved. The plaintiff could not testify to her conversation with the decedent because of the statutory prohibition. Her husband testified:

"I recall a conversation with my wife, in which she mentioned something Mrs. Leslie had said to her. That was in March, 1902; it was a Friday night, when I had come home from a trip, that I had this conversation. * * * The next Saturday afternoon I had a conversation with Mrs. Leslie. I said, 'Cousin Florence, my wife tells me you are going to leave her $50,000 in your will, and I wish to thank you.' Her reply was, 'Robert, I am due Annie that money for what she has done, rendering many services in my present condition, and I propose to call on her in the future.'"

The jury was justified in finding that from this evidence the decedent admitted a conversation with the defendant in error as to her services rendered and to be rendered, and as to the compensation to be paid for them in her will. The jury could say that this was language of an agreement to pay her. There was ample evidence of the services performed, and the extraordinary and somwhat humiliating character of them, such as few women of refinement could be induced to perform. The decedent was 77 years of age when she died. She had suffered a stroke of paralysis. She could not dress or walk without assistance. She refused to provide a maid or nurse, and the defendant in error performed the services which such employees would perform. Decedent left an estate of $2,000,000. She had an income of $95,000 a year. The decedent spoke to a Mrs. Lawrence, and said she was going to make provision for the defendant in error. She mentioned that defendant in error's aunt had met with a great loss, and that she intended to compensate the defendant in error. The defendant in error's son, a lawyer, testified that he talked with Mrs. Leslie "as to what she intended to do for my mother by will," and Mrs. Leslie said, "I don't see why your mother worries so much about the future, as I have provided for her." Further, she said, "Robert, your mother is going to be well paid for what she is doing for me, and I don't wish her to go."

Reasonable minds may differ as to whether or not this was an agreement by the testatrix to pay, and not the language of mere expectation or intention. The difference of opinion on the former and this appeal as to the meaning and understanding of the language employed by Mrs. Leslie argues strongly for the existence of a question of fact. Under the circumstances, the defendant in error being incompetent to testify in the absence of a written agreement upon the subject, it was, in the language of the Supreme Court, almost impossible to prove a direct verbal promise from decedent to her in regard to this contract.

"Any such promise must be largely inferred from the situation and circumstances of the parties, and must depend almost wholly on verbal statements made by Mr. Kenyon [Mrs. Leslie] to others." Brown v. Sutton, 129 U. S. 239, 9 Sup. Ct. 274, 32 L. Ed. 664.

Even if inconsistency appeared (I fail to find it) in this proof on the cross-examination from that of the direct, such would have been a matter which only affected the credibility of the testimony. It is untimely now to quarrel with the result of the jury's findings. This was a matter for the trial court. We cannot consider the weight of evidence. Wilson v. Everett, 139 U. S. 616, 11 Sup. Ct. 664, 35 L. Ed. 286; Canadian Ry. Co. v. Akre, 200 Fed. 955, 119 C. C. A. 250. The law as to the care and caution in considering claims of this character is well defined. McKeon v. Van Slyck, 223 N. Y. 392, 119 N. E. 851. These rules of law are beneficial and useful in instructions to the jury. Each case must be considered from the viewpoint of its own facts. The other danger must never be lost sight of:

"That advantage may be taken of the ignorant, confiding and helpless by those who promise, reap performance, and then procrastinate, dally, and die without living up to the great commandment of the law, to wit, to do justice and right, and to render to every one his due." McQuitty v. Wilhite, 247 Mo. 163, 152 S. W. 598.

I am satisfied that the command of the law required the submission of this proof to the jury. Because of this, and of our decision on the former appeal, I can conceive of no escape from an affirmance of this judgment.